1

2

3

4

5

6          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
7                    AT SEATTLE

8   RESIDENT COUNCILS OF
    WASHINGTON, et al.,
9                                              No.  C04-1691Z
                        Plaintiffs,
10
    v.                                         ORDER
11
    TOMMY G. THOMPSON, Secretary of
12  United States Department of Health and
    Human Services,
13
                        Defendant.
14

15

16  **I.     BACKGROUND**

17          Plaintiffs' challenge the decision of Defendant Secretary of Health and Human

18  Services (the "Secretary" or "Defendant") to promulgate regulations allowing the use of paid

19  "feeding assistants" in federally regulated nursing homes.  The challenged regulations were

20  promulgated by the United States Department of Health and Human Services' Centers for

21  Medicare & Medicaid Services ("CMS") and allow states to permit long term care facilities

22  participating in Medicare and/or Medicaid to use paid feeding assistants to supplement the

23  services of certified "nurse aides" ("CNAs") under certain conditions.  See First Amended

24  Complaint, docket no. 14, ¶¶ 1– 5.

25          Plaintiffs Resident Councils of Washington ("Resident Councils") and the

26  Washington State Long-Term Care Ombudsman Program (the "Ombudsman Program")

ORDER   1–

1    challenge the "feeding assistant" regulations.  Resident Councils is a non-profit organization

2    consisting of nursing home residents; the organization's primary goal is to empower

3    residents and protect nursing home quality of care.  Id. at ¶¶ 7, 48.  The Ombudsman

4    Program was created by statute and represents Washington long-term care facility residents;

5    its mission is to promote the interests, well-being, and rights of its members.  Id. at ¶¶ 8, 55.

6    In an earlier Order the Court dismissed individual Plaintiffs because they were unable to

7    make a showing of any injury.  See Order, docket no. 71, at 6.

8        The parties agree that feeding a resident with a complex feeding problem, such as a

9    swallowing disorder or recurrent lung aspirations, requires at least a nurse aide level of

10   training.  The parties disagree as to whether less complicated feeding assistance may be

11   provided by individuals without nurse aid training.  CMS contends that performing simple

12   tasks such as opening a milk carton, cutting meat, reminding a patient to eat, providing

13   dinner conversation for a depressed patient, and spoon feeding a resident who cannot feed

14   him or herself, does not require nurse aid training.[1]  CMS contends these routine, yet time-

15   consuming tasks, are critical to ensuring that nursing home residents take in sufficient

16   nutrients and fluids, but are not "nursing or nursing-related" services.

17   **A.       The Nursing Home Reform Act.**

18       In 1987, through the Omnibus Budget Reconciliation Act of 1987 (the "Nursing

19   Home Reform Law" or "Reform Law"), Congress enacted a comprehensive set of nursing

20   home reforms applicable to facilities that have provider agreements under Medicare and

21   Medicaid.  The goal of the reforms was to improve the quality of care in nursing homes.  The

22   Reform Law imposed new requirements on nursing homes participating in Medicare or

23   Medicaid and enacted measures to improve the enforcement process.  The Reform Law

24

25       [1] The final rule acknowledged that workers who pass out trays, provide beverages and
26   condiments, talk to and encourage residents, record food intake, and perform routine dining
     room tasks need not be trained as feeding assistants if they do not feed residents.  68 Fed. Reg.
     55,528, 55,532-33 (2003).

ORDER   2–

added significant requirements for nursing home operation in the areas of resident services, residents' rights, the survey and certification process, and the enforcement process.  See 42 U.S.C. §§ 1395i-3, 1396r.

The Reform Law imposed the following new requirements relating to resident services: (1) a nursing home must care for its residents "in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident," 42 U.S.C. §§ 1395i-3(b)(1)(A), 1396r(b)(1)(A); (2) a nursing home must prepare a written plan of care for each resident, which describes the services and activities that the facility plans to provide to meet the resident's individual needs, id. at §§ 1395i-3(b)(2), 1396r(b)(2); (3) a nursing home must conduct a standardized resident assessment for each resident, which identifies medical problems and assesses the resident's capability to perform daily life functions, and which is conducted or coordinated by a registered professional nurse at least annually, but which can be updated or performed more frequently if deemed necessary by nursing personnel, id. at §§ 1395i-3(b)(3), 1396r(b)(3); (4) a nursing home must provide or arrange for the provision of all services necessary to carry out each resident's plan of care, id. at §§ 1395i-3(b)(4), 1396r(b)(4); (5) a nursing home may use only full-time "nurse aides" who have received training and are competent, id. at §§ 1395i-3(b)(5), 1396r(b)(5); (6) a nursing home must provide resident medical care under the supervision of a physician, id. at § 1395i-3(b)(6), 1396r(b)(6); (7) a nursing home with more than 120 beds must employ at least one social worker, id. at §§ 1395i-3(b)(7), 1396r(b)(7); and (8) a nursing home must post certain information on nurse staffing, id. at §§ 1395i-3(b)(8), 1396r(b)(8).

The legislative history for the Nursing Home Reform Law indicates that Congress was "deeply troubled that the Federal government, through the Medicaid program, continues to pay nursing facilities for providing poor quality care to vulnerable elderly and disabled beneficiaries." H.R. Rep. No. 100-391(I) at 452, reprinted in 1987 U.S.C.C.A.N. at

ORDER  3–

1  2313-272.  Various studies and reports documented inadequate, "sometimes shockingly

2  deficient" care being provided at government certified nursing homes.  Id.  Accordingly, the

3  "central purpose" of the Reform Law was "to improve the quality of care for Medicaid-

4  eligible nursing home residents, and either to bring substandard facilities into compliance

5  with Medicaid eligibility quality of care requirements or to exclude them from the program."

6  Id.

7         At issue in this litigation is statutory language requiring training and competency for

8  nurse aides working in nursing homes.  The requirements state that a nursing home "must not

9  use on a full-time basis any individual as a nurse aide in the facility . . . for more than 4

10  months unless the individual . . . has completed a training and competency evaluation

11  program . . . and . . . is competent to provide nursing or nursing-related services."  42 U.S.C.

12  §§ 1395i-3(b)(5)(A), 1396r(b)(5)(A).  Congress defined a "nurse aide" to mean "any

13  individual providing *nursing or nursing-related services* to residents in a skilled nursing

14  facility, but does not include an individual (i) who is a licensed health professional . . . or a

15  registered dietician, or (ii) who volunteers to provide such services without monetary

16  compensation."  Id. at §§ 1395i-3(b)(5)(F), 1396r(b)(5)(F) (emphasis added).

17        While Congress provided a definition of "licensed health professional," it did not

18  provide a definition for the phrase "nursing or nursing-related services."

19  **B.    Regulatory Background.**

20        In 1991, CMS's predecessor, the Health Care Financing Administration ("HCFA"),

21  issued regulations implementing the nurse aide training and competency requirements.  See

22  42 C.F.R. § 483.152; 56 Fed. Reg. 48,880 (Sept. 26, 1991).  The regulations required that for

23  a nurse aide training and competency evaluation program to be approved by a state, it must

24  consist of a minimum of 75 hours of training.  42 C.F.R. § 483.152(a)(1).  The regulations

25  enumerated certain topics which must be included in the training curriculum.  Id. at

26

ORDER   4–

§ 483.152(b).  The category of "personal care skills" included the topics "assisting with eating and hydration" and "proper feeding techniques."  Id. at § 483.152(b)(3)(v), (vi).

The regulations used the same definition for "nurse aide" provided in the Reform Law.  A nurse aide was defined as "any individual providing *nursing or nursing-related services* to residents in a facility who is not a licensed health professional, a registered dietitian, or someone who volunteers to provide such services without pay."  Id. at § 483.75(e)(1) (emphasis added); see also 56 Fed. Reg. 48,880, 48,890.  Anyone performing nursing or nursing-related services who was not a licensed health professional, registered dietician, or volunteer, had to comply with the nurse aide training and competency requirements.  56 Fed. Reg. at 48,890.  The agency did clarify that "an individual must be directly involved in patient care to meet the definition of nurse aide.  For example, an individual who makes unoccupied beds or fills water pitchers would not necessarily be a nurse aide and therefore may not have to meet the nurse aide requirement."  Id.

In the 1991 regulations, the agency did not specifically address whether a nursing home could employ feeding assistants, but the implication of the final agency rule is that any individual directly involved in patient care would be required to meet the nurse aide training and competency requirements.  The agency subsequently took this position in responding to inquiries on the subject, and interpreted assisting a resident with eating as a "nursing-related" service.  The agency concluded that only certified nurse aides, volunteers, or health professionals could feed residents.  See, e.g., Plaintiffs' Motion, docket no. 50, Ex. 2 (Steinfort Letter), Ex. 3 (HCFA Website Q&A), Ex. 4 (Harkin Letter).

**C.    Promulgation of "Feeding Assistant" Regulations.**

On March 29, 2002, CMS proposed a rule change that would allow states to permit nursing homes to use paid feeding assistants to supplement the services of certified nurse aides for patients without complicated feeding problems.  See Notice of Proposed Rulemaking, 67 Fed. Reg. 15,149 (Mar. 29, 2002).  CMS announced the proposed rule

ORDER  5–

change and solicited public comments.  Id.  Because of the agency's prior position that

feeding assistance was a "nursing-related" service, see, e.g., Plaintiffs' Motion, docket no.

50, Ex. 4 (Harkin Letter), the rule change represented a change in policy and the agency's

prior position on "feeding assistants."  CMS acknowledged that the proposed rule amounted

to a change in policy.  See Notice of Proposed Rulemaking, 67 Fed. Reg. at 15,150-51

("[t]here is no provision in Federal regulations for the employment of nursing home workers

who perform only a single task without completing 75 hours of nurse aide training.

Currently, residents must be fed by a registered nurse, licensed practice nurse, or a nurse aide

who has completed 75 hours of medical training and who has been certified as competent to

perform all nurse aide tasks.").

CMS explained that the proposed rule change was necessitated by changing trends in

long-term care, and the realities of long-term care.  Concerns included a growing shortage of

nurse aides, the time-consuming nature of feeding assistance, increasing demands on nurse

aides, and an increasing aged population.  Id. at 15,150-51.  CMS described the positive

experience of two states that were using paid feeding assistants.  Id. at 15,151.  The preamble

concluded with the agency's assessment that the benefits to residents of the rule change

outweighed the risks, and with the agency's conclusion that a policy change to allow the use

of feeding assistants could be accommodated under existing federal law.  Id.

The proposed rule solicited comments from the public.  Id. at 15,149.  CMS received

over 6,000 public comments on the proposed rule.  68 Fed. Reg. 55,528, 55,530; see also

Administrative Record ("AR") (filed November 24, 2004 per Local Rule CR79(h)).  Ninety-

nine percent of the comments supported the proposal.  68 Fed. Reg. at 55,530.  Plaintiffs

argue that many of these comments were form letters submitted by the nursing home

ORDER   6–

1   industry, and that the 99 percent is misleading as it relates to source. See Borromeo Decl.,

2   docket no. 82.[2]  Nevertheless, there was substantial support for the proposal.

3          CMS promulgated the feeding assistant regulations in final form on September 26,

4   2003, and they became effective shortly thereafter on October 27, 2003. See 68 Fed. Reg.

5   55,528.

6   **D.      Final Regulations.**

7          The final regulations allow states the option of permitting nursing homes to use

8   feeding assistants under limited circumstances.  The regulations only permit the use of

9   feeding assistants where it is also permitted by state law. 42 C.F.R. § 483.35(h)(1)(ii).

10  Before feeding any resident, a feeding assistant must successfully complete a state-approved

11  training course meeting various requirements. Id. at §§ 483.35(h)(1)(I), 483.75(q).  Under

12  the challenged regulations, a feeding assistant may feed only those residents who have no

13  complicated feeding problems. Id. at § 483.35(h)(3)(I).  The regulations provide that

14  complicated feeding problems include, but are not limited to, difficulty swallowing, recurrent

15  lung aspirations, and tube or parenteral/IV feedings. Id. at § 483.35(h)(3)(ii).  The selection

16  of residents who qualify to be fed by a feeding assistant must be based on the charge nurse's

17  assessment and the resident's latest assessment and plan of care. Id. at § 483.35(h)(3)(iii).  A

18  feeding assistant must work under the supervision of a registered nurse or licensed practical

19  nurse. Id. at § 483.35(h)(2)(i).  In an emergency, a feeding assistant must call a supervisory

20  nurse for help on the resident call system. Id. at § 483.35(h)(2)(ii).  The final rule also states

21  that feeding assistants are to supplement, not replace, CNAs. 68 Fed. Reg. at 55,529,

22

---

23       [2] Plaintiffs created a comprehensive system for coding and tabulation of comment letters.
    The letters were input into Microsoft Excel and Access for tracking and analysis. See Borromeo
24  Decl., docket no. 82, at ¶¶ 3-4.  Ninety-three percent of letters submitted by nursing staff in
    support of the proposal were form letters. Id. at ¶ 7.  Seventy-six percent of letters submitted
25  by Nursing Directors were form letters. Id. at ¶ 9.  However, the Court rejects the Plaintiffs'
    assertion that the Secretary "cannot rely credibly" on any of the comment letters that were form
26  letters. See Plaintiffs' Opp., docket no. 81, at 21.  The Court agrees that the Secretary was
    absolutely entitled to rely upon the comment letters he received.

ORDER   7–

55,530.       The regulations provide that a state-approved training course for feeding

assistants must include, at a minimum, eight hours of training.  42 C.F.R. § 483.160(a).

Washington State has adopted the feeding assistant regulations.  See Washington Department

of Social and Health Services, Aging and Disability Services Administration: Memorandum

NH #2004-004 (Feb. 23, 2004), available at http://www.aasa.dshs.wa.gov/professional/

letters/nh/2004/04-004.htm.[3]

        Plaintiffs challenge the feeding assistant regulations alleging that they violate the

Nursing Home Reform Law and the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

The Parties have filed cross-motions for summary judgment.  In addition, the American

Health Care Association ("AHCA"), which was previously denied intervenor-Defendant

status, seeks to participate as amicus curiae.  The Court DENIES AHCA's motion to

participate as amicus curiae, docket no. 85.  The issues before the Court on summary

judgment have been fully addressed by the parties and additional briefing is not required.

## II.    DISCUSSION

        Summary judgment is appropriate where there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

moving party bears the initial burden of demonstrating the absence of a genuine issue of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party

has met this burden, the opposing party must show that there is a genuine issue of fact for

trial.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The opposing party must present significant and probative evidence to support its claim or

defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir.

---

        [3] Twenty-eight states have authorized use of feeding assistants in nursing homes; an
additional three states – Alabama, Arkansas, and Michigan – are developing plans to authorize
use of feeding assistants in the near future.  See Edelman Decl., docket no. 52, Ex. A (State
Laws and Policies Relating to Feeding Assistants).  CMS has estimated that of the 17,000
nursing homes in the country subject to the Nursing Home Reform Law, about 20% of them
ultimately will employ feeding assistants.  68 Fed. Reg. 55,536.

ORDER   8–

1   1991).  The parties to this case agree that there is no genuine issue of material fact and that

2   this dispute is ripe for consideration on summary judgment.  See Plaintiffs' Motion, docket

3   no. 50, at 2; see also Defendant's Cross-Motion, docket no. 80, at 14.

4        The Administrative Procedure Act ("APA") governs judicial review of agency action.

5   See 5 U.S.C. § 701 et seq.  Under the APA, a district court may set aside formal agency

6   action, such as the promulgation of the challenged feeding assistant regulations, only if

7   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Id.

8   at § 706(2)(A); Wilderness Society v. U.S. Fish & Wildlife Serv., 353 F.3d 1051, 1059 (9th

9   Cir. 2003) (en banc).

10  **A.      Violation of Nursing Home Reform Law**

11       The parties dispute whether single task workers providing feeding assistance provide a

12  nursing-related services in violation of the Nursing Home Reform Law.  Plaintiffs argue that

13  the Secretary's interpretation of the phrase "nursing or nursing-related services" to exclude

14  the feeding of residents under the conditions set forth in the regulations directly conflicts

15  with the fundamental purpose of the Nursing Home Reform Law.

16       The Secretary bears the primary responsibility for administering the Nursing Home

17  Reform Law, and his interpretation is entitled to substantial deference upon judicial review.

18  Leisnoi, Inc. v. Stratman, 154 F.3d 1062, 1068 (9th Cir. 1998).  The Court may not "simply

19  impose its own construction on the statute" without regard to the Secretary's regulations.

20  Chevron U. S. A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843

21  (1984).  Under Chevron, the Court engages in a two-step analysis of agency statutory

22  interpretation:

23       Under the first step: If the intent of Congress is clear, that is the end of the matter;
         for the court, as well as the agency, must give effect to the unambiguously
24       expressed intent of Congress . . . .  Conversely, at step two of Chevron, when
         applicable, we recognize that if a statute is silent or ambiguous with respect to the
25       issue at hand, then the reviewing court must defer to the agency so long as the
         agency's answer is based on a permissible construction of the statute.

26

ORDER   9–

Wilderness Society, 353 F.3d at 1059 (internal quotation marks and citations omitted); see

also CHW West Bay v. Thompson, 246 F.3d 1218, 1223 (9th Cir. 2001); Defenders of

Wildlife v. Browner, 191 F.3d 1159, 1162 (9th Cir. 1999).

**1.      Clear intent of Congress**

> If the intent of Congress is clear, that is the end of the matter; for the court, as
> well as the agency, must give effect to the unambiguously expressed intent of
> Congress.

Wilderness Society, 353 F.3d at 1059.  In determining whether Congress has "directly"

spoken to the "precise" question at issue, see Chevron, 467 U.S. at 842, the Court applies

"'traditional tools of statutory construction,' and if a court using these tools ascertains that

Congress had a clear intent on the question at issue, that intent must be given effect as law."

Wilderness Society, 353 F.3d 1059 (quoting Chevron, 467 U.S. at 843 n.9).  "Questions of

congressional intent 'are still firmly within the province of the courts under Chevron.'" Id.

at 1059; see also Defenders of Wildlife, 191 F.3d at 1164.

Canons of statutory construction help provide meaning to words in a statute, and the

Court must begin with the language of the statute.  Wilderness Society, 353 F.3d at 1060

(citing Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 56 (1987)

("It is well settled that the starting point for interpreting a statute is the language of the

statute itself.") (internal quotation marks and citation omitted).  "[U]nless otherwise defined,

words will be interpreted as taking their ordinary, contemporary, common meaning." Id.

(citing United States v. Smith, 155 F.3d 1051, 1057 (9th Cir. 1998)).  The words of a statute

must be read in context with a view to their place in the overall statutory scheme.  Id.  If

necessary to discern the intent of Congress, the Court "may read statutory terms in light of

the purpose of the statute." Id.  Thus, the structure and purpose of a statute may provide

guidance in determining the plain meaning of its provisions.  Id.; see also United States v.

Lewis, 67 F.3d 225, 228-29 (9th Cir. 1995) ("Particular phrases must be construed in light of

the overall purpose and structure of the whole statutory scheme.").  Where the language of

ORDER   10–

1   the statute is clear, the Court may not defer to an agency's interpretation. <u>Medtronic, Inc. v.</u>

2   <u>Lohr</u>, 518 U.S. 470, 512 (1996).

3       Defendant argues that Congress did not express its intent as to whether feeding

4   assistants aiding nursing home residents without complicated feeding problems is a

5   "nursing-related service."  <u>See</u> Defendant's Cross-Motion, docket no. 80, at 16.  Defendant

6   notes that Congress did not define the phrase "nursing or nursing-related services," in either

7   the statute or its legislative history, <u>see</u> 42 U.S.C.§§ 1395i-3(b)(5)(F), 1396r(b)(5)(F); H.R.

8   Rep. No. 100-391(I) at 457, 930, <u>reprinted</u> <u>in</u> 1987 U.S.C.C.A.N. at 2313-277, 2313-547.

9   Defendant contends that there is no common or universally accepted meaning of the phrase

10  to which the Court may refer.  In addition, Defendant argues that the mere fact that nurse

11  aides routinely provide feeding assistance is of no consequence, because feeding assistants

12  would never assist persons with pronounced eating complications.  <u>See</u> 68 Fed. Reg. 55,528,

13  55,530-31.  Defendant urges the Court to consider a relatively narrow question: whether

14  feeding assistants perform "nursing-related" services when they assist *only* residents without

15  complicated feeding problems.

16      Plaintiffs counter that the Nursing Home Reform Law was remedial in nature, seeking

17  to resolve problems within the nursing home industry; as such, Plaintiffs argue a broad

18  construction is warranted to effectuate the "clear intent" of Congress.  <u>See</u> <u>Tcherepnin v.</u>

19  <u>Knight</u>, 389 U.S. 332, 336 (1967) (It is a "familiar canon of statutory construction that

20  remedial legislation should be construed broadly to effectuate its purposes."); <u>see</u> <u>also</u> <u>Hason</u>

21  <u>v. Medical Bd. of California</u>, 279 F.3d 1167, 1172 (9th Cir. 2002).[4]

22      Plaintiffs argue this case is analogous to the Ninth Circuit's recent en banc decision in

23  <u>Wilderness Society</u>.  In that case, the Ninth Circuit analyzed the "language, purpose, and

24  _____

25      [4] Plaintiffs argue that Congress's explicit delegation of tasks to the Secretary in the
    Reform Law suggests that Congress did not intend to implicitly delegate to the Secretary the
    authority to define the phrase "nursing or nursing-related services."  <u>See</u> Plaintiffs' Opp., docket
26  no. 81, at 6-8.  This contention is without supporting legal authority and ignores the distinction
    between explicit and implicit delegation of authority.  <u>See</u>, <u>e.g.</u>, <u>Chevron</u>, 467 U.S. at 843-44.

ORDER   11–

1  structure" of the federal Wilderness Act which defined "wilderness," in part, as "an area

2  where the earth and its community of life are untrammeled by man." <u>Id.</u> at 1061.  The

3  statute barred "commercial enterprise" in wilderness areas.  <u>Id.</u>  The Ninth Circuit stated that

4  "[b]ecause the aim of Congress in the Wilderness Act to prohibit commercial enterprise

5  within designated wilderness is clear, we do not owe deference to the USFWS's

6  determination regarding the permissibility of the Enhancement Project if it is a commercial

7  enterprise." <u>Id.</u> at 1062 (citing <u>Chevron</u>, 467 U.S. at 842-43).  Similarly, this Court would

8  owe no deference to CMS's determination regarding the permissibility of feeding assistants,

9  if it found that feeding assistants perform nursing-related services.

10       Plaintiffs argue that the language, purpose, and structure of the Nursing Home Reform

11  Law demonstrates congressional intent to require all hands-on nursing home care to be

12  provided exclusively by licensed health professionals, registered dieticians, and CNAs.

13  Plaintiffs note that a significant component of the Nursing Home Reform Law is increased

14  nurse staffing requirements and the establishment of federal standards for nurse aide

15  certification.  Thus, Plaintiffs contend the Reform Law's purpose – to resolve issues of

16  substandard nursing home care – is relevant in this context.  Plaintiffs urge that because paid

17  feeding assistants will not be CNAs, and will not be subject to federal CNA training and

18  competency requirements, the purpose of the Reform Law will be frustrated.  Plaintiffs

19  contend that allowing single-task feeding assistants may lead to other single-task workers

20  (e.g. bathing assistants, toilet assistants, dressing assistants, transfer assistants, etc.), resulting

21  in a handful of CNAs working in concert with numerous poorly trained "single-task"

22  workers.

23       However, whether the Reform Law addresses the issue of single task workers or the

24  definition of "nursing-related services" is not resolved by speculation about the future of

25

26

ORDER   12–

single-task workers or collateral impacts of promulgated regulations.[5]  The statute does not

define "nursing or nursing-related services."  <u>See</u> 42 U.S.C.§§ 1395i-3(b)(5)(F),

1396r(b)(5)(F).  There is nothing in the statute that equates "nursing or nursing-related

services" with "all hands-on nursing home care" as Plaintiffs allege.  <u>See</u> Plaintiffs' Motion,

docket no. 50, at 13.  Plaintiffs' argument that these regulations will have an impact on nurse

aide training requirements is unpersuasive, because the final rule provides that feeding

assistants may supplement, but not replace, CNAs.  <u>See</u> 68 Fed. Reg. 55,528, 55,529; 67

Fed. Reg. 15,149, 15,150.  The Court is persuaded by the Defendant's argument that its

interpretation of "nursing or nursing-related services" to allow nursing homes to supplement

their nursing staff with employees solely to provide additional assistance furthers the purpose

of the Reform Law to improve the quality of care in nursing homes, and thus is an entirely

reasonable construction of the statute.  <u>See</u> Defendant's Cross-Motion, docket no. 80, at 15.

Congress did not define the phrase "nursing or nursing-related service" in either the

Reform Law or its legislative history.  As such, the Court agrees with the Defendant that

Congress has not directly addressed the precise question at issue and has left to the Secretary

the task of providing meaning and context to the phrase.  Thus, the Court considers step two

of <u>Chevron</u> to determine if the agency's interpretation is reasonable and is not contrary to

congressional intent.[6]

## 2.   <u>Chevron</u> deference

"If . . . the court determines Congress has not directly addressed the precise
question at issue, the court does not simply impose its own construction on the

---

[5] The regulations challenged in this lawsuit do not deal with any other class of single-task
worker.

[6] Plaintiffs concede that a significant portion of a feeding assistant's tasks are not "nursing
or nursing-related" services that would require nurse aid training.  <u>See</u> Plaintiffs' Opp., docket
no. 81, at 15.  Plaintiffs insist, however, that where feeding assistants provide encouragement
and minimal assistance with eating or drinking the feeding assistant performs a "nursing-related"
service.  The Court agrees with the Secretary that this apparent conflict in position undermines
the Plaintiffs' contention that "nursing or nursing-related services" means all hands-on care
provided to residents.  <u>See</u> Defendants' Resp., docket no. 84, at 8-9.

statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."

Chevron, 467 U.S. at 843.  In determining whether an agency's construction of a statute is permissible, "'the [C]ourt need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the [C]ourt would have reached if the question initially had arisen in a judicial proceeding,' but only that the agency's interpretation is reasonable and is not contrary to congressional intent." Seldovia Native Ass'n v. Lujan, 904 F.2d 1335, 1342 (9th Cir. 1990) (quoting Chevron, 467 U.S. at 843 n. 11)).  Plaintiffs argue the Secretary's decision is entitled to no deference because "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view."  See I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 446 n.30 (1987).  The agency's "new" position is entitled to deference only if "the agency *acknowledges and explains* the departure from its prior views."  Seldovia, 904 F.2d at 1346 (emphasis added).  An "initial agency interpretation is not instantly carved in stone and the agency, to engage in informed rulemaking, must consider varying interpreattions and the wisdom of its policy on a continuing basis."  Chevron, 467 U.S. at 863-64.  "An agency is not required to establish rules of conduct to last forever, but rather must be given ample latitude to adapt its rules and policies to the demands of changing circumstances."  Rust v. Sullivan, 500 U.S. 173, 186-87 (1991) (internal citations and quotations omitted).[7]

---

[7] Plaintiffs argue that the Secretary's statutory interpretation of "nursing or nursing-related services" is a *post hoc* rationalization for the agency action, inconsistent with the agency's prior assertion that "nursing or nursing-related services" was "definable."  See Plaintiffs' Reply, docket no. 81, at 2.  This argument is without merit.  The final rule acknowledged that "'nursing' or 'nursing related' skills" were undefined in the legislation.  See 68 Fed. Reg. 55,528.

ORDER  14–

1          **a.      The Agency's Interpretation.**

2          CMS determined some nursing home residents need only minimal assistance or

3   encouragement at mealtimes and that such assistance does not require nursing training, and

4   does not constitute a "nursing-related" service.  Plaintiffs urge that the final regulations

5   frustrate Congressional intent and thus are not a permissible interpretation of the reform law.

6   See, e.g., Akhtar v. Burzynski, 384 F.3d 1193, 1198 (9th Cir. 2004) ("We do not owe

7   deference, however, to agency regulations if they construe a statute in a way that is contrary

8   to congressional intent or that frustrates congressional policy.").

9          Plaintiffs argue that the Secretary's interpretation will frustrate Congressional intent

10  because it will result in a reduced quality of care in nursing home facilities.  See Plaintiffs'

11  Motion, docket no. 50, at 20-21.  However, this argument is pure speculation.  There is no

12  support in the record for Plaintiffs' conclusion that the implementation of the feeding

13  assistant regulations will result in a reduced level of care.

14         Plaintiffs also argue that the feeding assistant regulations will frustrate Congressional

15  intent because they would allow for other single-task workers.  See Plaintiffs' Motion,

16  docket no. 50, at 21.  This unsupported speculation does not assist the Court with the

17  question presented.

18         Lastly, Plaintiffs argue that the feeding assistant regulations will frustrate

19  Congressional intent because nurse aide training is inadequate.  Id. (citing HHS OIG, Nurse

20  Aide Training, Rep. No. OEI-05-01-00030 (2002) (hereafter "HHS OIG, Nurse Aide

21  Training"), available at oig.hhs.gov/oei/reports/oei-05-01-00030.pdf).  The HHS report cited

22  by the Plaintiffs concludes that "nurse aide training has not kept pace with nursing home

23  industry needs." HHS OIG, Nurse Aide Training, at 9.  However, even if true, the fact that

24  nurse aide training may not have kept pace with nursing home industry needs has no bearing

25  on the Court's inquiry as to whether feeding assistant regulations frustrate Congressional

26  intent.

ORDER   15–

1    CMS received over 6,000 public comments on the proposed rule, with ninety-nine

2    percent of comments in support of the proposal.  68 Fed. Reg. 55,528, 55,530.  Nursing

3    professionals providing comments considered feeding assistant tasks to be "non-nursing"

4    tasks.  See, e.g., Defendant's Cross-Motion, docket no. 80, Ex. A (RR 1887, 7583).  In

5    addition, the record reflects CMS's response to comments adverse to the regulations,

6    including the addition of provisions specifically defining conditions that would preclude the

7    use of a feeding assistant, see 42 C.F.R. § 483.35(h)(3)(ii); requiring training prior to

8    resident care, see id. at § 483.35(h)(1)(i); and more frequent assessment of a resident's

9    condition.  See id. at § 483.35(h)(3)(iii).  The successful use of feeding assistant programs in

10   Wisconsin and North Dakota further supports the reasonableness of the challenged

11   regulations.  68 Fed. Reg. at 55,530; see also Defendant's Cross-Motion, docket no. 80, Ex.

12   A (RR 5542-43) (discussing two research studies that support the value of using single-task

13   workers who focus on assisting elders to eat and drink); Ex. B (RR 5826-33) (letter of

14   support from Wisconsin Association of Homes and Services for the Aging, discussing

15   successful use of feeding assistants in Wisconsin); Ex. C (RR 2626-27) (discussing a North

16   Dakota nursing home's positive experience with feeding assistants).

17       CMS argues that the fact that nursing home residents receive inadequate feeding

18   assistance is well documented.  See Defendant's Cross-Motion, docket no. 80, at 23 (citing

19   CMS Report to Congress, Appropriateness of Minimum Nurse Staffing Ratios in Nursing

20   Homes, at chapter 14, available at http://www.cms.hhs.gov/medicaid/reports/rp700-14.pdf.).

21   CMS points to numerous comments as evidence of an ongoing CNA shortage.  See

22   Defendant's Cross-Motion, docket no. 80, Ex. A (RR 66-67, 80, 4094, 4142, 4151-54, 4198,

23   4234-35, 4535, 5485, 5487, 5822, 6920, 8649-50).  The agency concluded that the feeding

24   assistant regulations address the  problem by providing a way for nursing homes to ease the

25   burden of overworked nurse aides and meet the nutrition and hydration needs of residents.

26   Lastly, the Court notes that Plaintiffs have proffered no evidence that the proposed

ORDER   16–

1  regulations will cause harm to nursing home residents beyond mere speculation and

2  conjecture.

3       The Court concludes that the regulations are not inconsistent with the intent of

4  Congress to improve the quality of nursing home care and do not violate the Nursing Home

5  Reform Law.  The determination by CMS that feeding assistants under the regulations do not

6  provide "nursing-related" services is a permissible interpretation of the Reform law that does

7  not frustrate Congressional intent.

8  **B.     Administrative Procedure Act**

9       The APA governs judicial review of agency action.  5 U.S.C. § 701 et seq.  The

10  district court may set aside formal agency action that is arbitrary and capricious, or an abuse

11  of discretion.  Id. at § 706(2)(A); see also Wilderness Society, 353 F.3d at 1059.  Plaintiffs

12  claim that CMS acted arbitrarily and capriciously by promulgating the feeding assistant

13  regulations.  Plaintiffs allege that CMS acted without sufficient evidentiary support for its

14  policy change, without proper evidence regarding feeding assistant programs in Wisconsin

15  and North Dakota, and without considering all the evidence relating to the nurse aide

16  shortage.

17       The scope of review under the arbitrary and capricious standard is narrow, and the

18  Court must not substitute its judgment for that of the agency.  Motor Vehicle Mfrs. Ass'n v.

19  State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  "[T]he agency must examine the

20  relevant data and articulate a satisfactory explanation for its action including a 'rational

21  connection between the facts found and the choice made.'"  Id. (quoting Burlington Truck

22  Lines v. United States, 371 U.S. 156, 168 (1962)).  In considering whether an agency's

23  action was arbitrary and capricious, the "agency's action must be upheld, if at all, on the

24  basis articulated by the agency itself."  Beno v. Shalala, 30 F.3d 1057, 1074 (9th Cir. 1994).

25           Normally, an agency rule would be arbitrary and capricious if the agency has
             relied on factors which Congress has not intended it to consider, entirely failed to
26           consider an important aspect of the problem, offered an explanation for its
             decision that runs counter to the evidence before the agency, or is so implausible

ORDER   17–

that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle, 463 U.S. at 43.

**1.      State Feeding Assistant Programs**

Plaintiffs first argue that the Secretary has no evidence which supports the claims of success with feeding assistants in Wisconsin and North Dakota. The Secretary relied on the alleged success in these states in the promulgation of feeding assistant regulations. Plaintiffs allege the lack of evidence means that the Secretary's decision is necessarily arbitrary and capricious, because it lacks foundation and evidentiary support.

The agency alleges that the feeding assistant regulations are supported by evidence of positive results from Wisconsin and North Dakota, and an absence of evidence of negative reports from those states. See Defendant's Cross-Motion, docket no. 80, Ex. A (RR 5542-43) (letter summarizing results of two research studies on the effects of using single-task feeding assistants); Ex. B (RR 5833) (Secretary of Wisconsin DHFS statement that "there have been no poor outcomes nor care violations related to single task workers"); Ex. C (RR 9067-68) (North Dakota Board of Nursing statement that North Dakota's use of feeding assistants for over ten years did not result in reports of decreased patient safety); Ex. C (RR 5876) (letter from the North Dakota congressional delegation referencing positive results of feeding assistant programs). Defendant also relied on comment letters from Wisconsin and North Dakota residents attesting the value of the feeding assistant programs.

Plaintiffs' claims that the Secretary's promulgation of feeding assistant regulations was not supported by "credible" evidence must fail. The Secretary's reliance on evidence from Wisconsin and North Dakota was justified. Those states were conducting feeding assistant programs and their experiences were relevant to the consideration of the proposed regulation. Plaintiffs allegation that there was insufficient evidence must also fail.[8] The

---

[8] After the promulgation of the final regulations, CMS continued to consider the merits of opposition to paid feeding assistants. CMS sent a Request for Task Order Proposal (RTOP)

ORDER  18–

1   Secretary's decision was supported on the evidence, and the Court cannot conclude it was

2   arbitrary and capricious.

3   **2.      Nurse Aide Shortage**

4         Plaintiffs second argument is that in justifying feeding assistant regulations, the

5   Defendant did not consider the actual reasons behind the nurse aide labor shortage.

6   Plaintiffs argue that the regulations implicitly and incorrectly assume that nurse aide

7   shortages result from the training requirement, while the real reason for the shortage relates

8   to nurse aide retention.  Plaintiffs and Defendant acknowledge it is difficult to retain nurse

9   aides because of low wages, poor benefits, and difficult work.  CMS claims it considered

10  numerous reasons for the nurse aide labor shortage and determined that relieving stress on

11  nurse aides by allowing feeding assistants would help with retention issues.  CMS

12  acknowledges high vacancy and turnover rates among nurse aides; however, it claims that its

13  decision to address the nurse aide shortage in this manner was not arbitrary and capricious.

14        Plaintiffs argument that CMS did not properly consider the reasons behind the nurse

15  aide shortage is without merit.  The agency acknowledged the factors Plaintiffs claim were

16  not considered.  <u>See</u> 68 Fed. Reg. 55,528, 55,529 at n. 1, 2, 3.  Plaintiffs contention that

17  Defendant did not adequately consider or address these concerns in the regulations must fail.

18

19

20

21  on June 18, 2004, soliciting proposals for a "Study of Paid Feeding Assistant Programs."  <u>See</u>

22  Plaintiffs' Motion, docket no. 50, Ex. 14.  Plaintiffs note that the Request admitted that "little
    is actually known about the effects of having paid feeding assistants in nursing homes" and

23  argue that the Request concedes the anecdotal nature of the information received from
    Wisconsin and North Dakota. <u>Id.</u> at 3-4.  However, characterization of the evidence relied upon

24  as merely anecdotal ignores the informal reports by the states of the positive effects of the
    programs, and the numerous positive comments received from residents.  In addition, the

25  Request for Proposal evidences an intent by CMS to investigate the merits of opposition to
    feeding assistants and possible negative effects on the quality of care in nursing homes through

26  a formal study.  However, the Request for Proposal does not establish that CMS had an
    insufficient evidentiary basis for its regulation or that it acted in an arbitrary and capricious
    manner.

ORDER   19–

1

### 3.     Change of Policy

2   Plaintiffs' final argument is that the Defendant's reversal of policy in itself evidences an

3   arbitrary and capricious change in policy.  Plaintiffs argue these circumstances are similar to

4   Fund for Animals v. Norton, 294 F. Supp. 2d 92, 105 (D. D.C. 2003), where the Court

5   discussed "administration" related agency policy changes:

6
> The Court is faced with the review of an agency decision that amounts to a 180
> degree reversal from a decision on the same issue made by a previous
7
> administration . . . .  This dramatic change in course, in a relatively short period
> of time and conspicuously timed with the change in administrations, represents
8
> precisely the reversal of the agency's views that triggers an agency's
> responsibility to supply a reasoned explanation for the change.

9

10  Id. at 105 (D. D.C. 2003) (internal quotation marks and citations omitted).  Plaintiffs argue

11  that the policy change in this case requires a reasoned explanation because it is a "180 degree

12  reversal" of prior agency policy.  Plaintiffs argue there is no support for the change in the

13  record.

14          Plaintiffs argument is unpersuasive.  Regardless of any change in administration, the

15  agency policy change was well supported and explained by the agency.  Unlike Fund for

16  Animals, where the Court concluded the agency explanation was "unreasoned" and

17  "quintessentially arbitrary and capricious," the policy change at issue here was explained by

18  the Secretary and based on evidence before the agency.  Dissenting viewpoints were

19  acknowledged and addressed.  The documented workforce needs of the industry and the

20  needs of nursing home residents were considered.  The feeding assistant regulations were

21  promulgated in response.  Moreover, the characterization of the agency policy change as a

22  "180 degree reversal" overstates the actual change in agency policy.  While the final

23  regulation allowing for feeding assistants in limited circumstances certainly represents a

24  change in policy, it only reverses prior agency interpretation under limited circumstances.

25  The Court therefore concludes that Defendant's adoption of the feeding assistant regulations

26  was not arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

ORDER   20–

1    **III.   CONCLUSION**

2        For the reasons stated in this Order, the Court DENIES the Plaintiffs' Motion for

3    Summary Judgment, docket no. 50 and GRANTS the Defendant's Cross-Motion for

4    Summary Judgment, docket no. 80.  The Court DENIES the American Health Care

5    Association's Motion to file and Amicus Curiae brief, docket no. 85.

6        Also pending before the Court is Plaintiffs' Motion to Certify Class, docket no. 54.

7    Because the Court grants the Defendant's Cross-Motion for Summary Judgment, docket no.

8    80, the Court STRIKES AS MOOT the Plaintiffs' Motion to Certify Class, docket no. 54.

9

10       IT IS SO ORDERED.

11       Dated this 31st day of August, 2005.

12

13                                              Thomas S. Zilly

14                                              Thomas S. Zilly
                                                United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

ORDER   21–